UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEPHEN KNOWLES Trustee of the Bricklayers of Indiana Retirement Fund, BRICKLAYERS AND TROWEL TRADES INTERNATIONAL PENSION FUND, BRICKLAYERS AND ALLIED CRAFTWORKERS INTERNATIONAL HEALTH FUND (As Successor to Bricklayers of Indiana Health and Welfare Fund), INDIANA BRICKLAYERS LOCAL 4 TILE AND TERRAZZO APPRENTICESHIP TRAINING COMMITTEE, BRICKLAYERS LOCAL 4 IN/KY, INDIANAPOLIS PENSION FUND, LOUISVILLE PENSION FUND, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:19-cv-03877-SEB-DLP |
| ROSA MOSAIC AND TILE COMPANY, VESTA TILE & STONE, LLC (KY) a Kentucky limited liability company, VESTA TILE & STONE LLC (IN) an Indiana foreign limited liability company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs—which are pension and health and welfare funds ("the Funds") related

to the Tile, Marble and Terrazzo Journeyman and Finishers International Union of

Bricklayers and Allied Craftworkers Local Union No. 4 of Indiana and Kentucky (the

"Union")—have sued Rosa Mosaic and Tile Company ("Rosa Mosaic") and Vesta Tile &

Stone LLC ("Vesta Tile"). Rosa Mosaic, a Kentucky corporation that has been in the

business of tile and terrazzo installation services since 1937, was a signatory to a series of collective bargaining agreements with the Union, under which Rosa Mosaic was required to make fringe benefit contributions to the Funds on behalf of its employees. In 2010, the owners of Rosa Mosaic formed a new company, Vesta Tile, which also performs tile installation work, but has never been party to a collective bargaining agreement with any labor union. In this action filed under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the Funds allege that Vesta Tile is a sham company used by Rosa Mosaic to allow it to do work covered by the collective bargaining agreements without making the appropriate fringe benefit contributions. More specifically, the Funds allege that Vesta Tile and Rosa Mosaic are a single employer, or alternatively, that Vesta Tile is Rosa Mosaic's alter ego, such that Vesta Tile is liable for unpaid contributions to the Funds on behalf of its employees. Vesta Tile has moved for summary judgment which we deny for the reasons explained below.[1]

## I.      STANDARDS OF REVIEW

"A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law." *Hulse v. Martoccia*, 2019 WL 3840319, at *1 (S.D. Ind. Aug. 15, 2019) (Barker, J.) (citing Fed. R. Civ. P. 56(a)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the

---

[1] The Funds have also filed a Motion for the Court to Take Judicial Notice of Certain Facts and Supplement the Record [Docket No. 111], and a Motion for Leave to File a Surreply to Defendant's Summary Judgment Motion [Docket No. 123]. We address both motions below.

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986). Material facts are those that "might affect the outcome of the suit," and a dispute about a material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

Summary judgment is neither "a vehicle for resolving factual disputes" nor a "paper trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). As such, "the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Id.* Indeed, the court "cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder." *Hulse*, 2019 WL 3840319 at *1 (citing *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014)). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920 (citing *Anderson,* 477 U.S. at 249–50). When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

"Summary judgment practice requires the parties and courts alike to roll up their sleeves." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020). "Discerning the existence of a 'genuine dispute as to any material fact' can be tedious and time consuming." *Id.* "Today's Federal Rules recognize this and strive to ease the burden

on courts by requiring a 'party asserting that a fact cannot be or is genuinely disputed' to support that position by citing 'particular parts of materials in the record' or, conversely, 'showing that the materials cited do not establish the absence or presence of genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Id.* (quoting Fed. R. Civ. P. 56(c)(1)). Our Local Rules require further that parties "submit factual statements to assist with identifying and isolating the disputed from the undisputed—all to help the court assess whether a particular claim should proceed to trial or instead can be resolved on the existing record." *Id.* "The aim is not to make busywork but instead 'to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions.'" *Id.* (quoting *Waldridge*, 24 F.3d at 923). Specifically, these Local Rules require the party seeking summary judgment to submit a section designated "Statement of Material Facts Not in Dispute," and the non-moving party must respond with a "Statement of Material Facts in Dispute" that "identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. Local Rule 56-1. "Such statements should contain only material facts, 'not . . . mere background facts,' and must 'state facts, not the party's argument.'" *Hinterberger v. City of Indianapolis*, 2019 WL 1439159, at *2 (S.D. Ind. Mar. 30, 2019) (Barker, J.) (quoting S.D. Ind. Local Rule 56-1).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

We address a few preliminary matters before turning to our recitation of the facts. While as this order reflects the Funds ultimately succeed in identifying enough genuine disputes of material fact to preclude summary judgment, we pause to note how their summary judgment briefing practices have made the court's already "tedious and time consuming" task even more onerous. *Hinterberger*, 966 F.3d at 527. For example, the Funds, on multiple occasions, stated the same fact in *both* their "Statement of Material Facts in Dispute" section (which contains twenty-three paragraphs) and in their "Statement of Material Facts Not in Dispute" section (which contains one-hundred-and-sixty-four paragraphs). The Funds also needlessly repeated *many* of Vesta Tile's undisputed and background facts in their own lengthy undisputed facts section, occasionally referencing the same undisputed fact numerous times. Adding to the confusion was that many of the Funds' "disputed" facts are not actually in dispute at all, rather an assertion that Vesta Tile did not advise the court of some fact, when in truth Vesta Tile did, indeed, include it in their brief. "An advocate's job is to make it easy for the court to rule in his [or her] client's favor." *Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006). That goal was never achieved here.

We also address the Funds' Motion for the Court to Take Judicial Notice of Certain Facts and to Supplement the Record, seeking to have admitted a number of facts derived from publicly available documents that Defendants had filed with the Kentucky Secretary of State, and certain other facts excerpted from the docket of Rosa Mosaic's bankruptcy proceeding in the United States Bankruptcy Court for the Western District of Kentucky. Vesta Tile has neither objected nor responded to this motion. Federal Rule of Evidence

201(b)(2) provides that a court may take judicial notice of a fact that is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

Regarding the documents on file with the Kentucky Secretary of State, the Funds seek judicial notice of Anna Tatman's role as Vesta Tile's President as set forth in the company's "Statement of Change of Registered Office, Registered Agent, or Both" filed on June 18, 2019, and on Vesta Tile's 2019 Annual Report. The Funds also request that we take judicial notice of Kim Schultz—Rosa Mosaic's Controller—who signed Vesta Tile's 2018 Annual Report as its Controller. We agree that these are readily ascertainable facts of which the Court may properly take judicial notice: they have given rise to no disputes and can be accurately and "readily determined from sources whose accuracy cannot reasonably be questioned." F. R. Evid. 201(b)(2); *see Deborah Caruso the Chapter 7 Tr. for ITT Educ. Servs., Inc. v. Modany*, 613 B.R. 254, 267 n.4 (S.D. Ind. 2020) (explaining that "the Court may take judicial notice of public documents available through the Delaware Secretary of State such as Articles of Incorporation."); *Wells Fargo Bank, N.A. v. Langa Air, Inc.*, 2010 WL 4272586, at *1 n.1 (S.D. Ill. Oct. 25, 2010) (taking judicial notice of Missouri Secretary of State records because a court may "judicially notice public records and government documents."). Accordingly, we take judicial notice of these facts in our recitation below.

Regarding the facts derived from the bankruptcy court docket relating to Rosa Mosaic's proceeding there, the Funds request that we take judicial notice of Rosa Mosaic's filing in the form of a motion to reject its collective bargaining agreement with

the Union, pursuant to 11 U.S.C. § 1113, along with a document that Rosa Mosaic attached to its motion. "Courts routinely take judicial notice of the actions of other courts or the contents of filings in other courts." *Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016) (citing *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997)). These facts thus can also properly be judicially noticed, given that they are not in dispute and their accuracy is readily ascertainable from the Bankruptcy Court's docket. Thus, these facts shall be included as such hereafter.

The following remaining facts, taken from the parties' summary judgment materials and recounted below, are not necessarily objectively true, but for purposes of our analysis here are viewed in the light most favorable to the Funds as the non-movants.

### A. THE FAMILY BUSINESSES

Sometime in the 1980s, John Cristofoli, Sr. purchased Rosa Mosaic. Subsequently, three of his children, Anna Tatman, John Cristofoli, Jr. ("John"), and Louis Cristofoli purchased shares of Rosa Mosaic.[2] After their father's death in 2000, Anna, John, and Louis purchased their father's shares from Rosa Mosaic to become the company's sole

---

[2] The Funds include the following as a disputed material fact: "Defendant claims that Anna and John are co-owners of Rosa but do not advise the court that they are brother and sister." This contention is an example of the Funds' often frustrating practices in its summary judgment response. First, Vesta Tile did in fact spend two paragraphs in its factual background section explaining these family relationships —Vesta Tile specifically advised the court that Anna and John are brother and sister. That they chose to include it in the factual background section, as opposed to the material facts not in dispute section, is of no consequence. Our Local Rules explicitly provide that background facts do not need to be included in the material facts section. *Hinterberger*, 2019 WL 1439159 at *2. Additionally, the Funds have included these familial relationships as undisputed facts on *three* separate occasions. As explained above, these misleading and often confusing practices have complicated the Court's task in resolving the pending motion.

owners. Louis later decided to retire from the company and sold his shares to Anna and John, who have remained Rosa Mosaic's owners throughout the relevant time period. Specifically, Anna owned a 51 percent interest in Rosa Mosaic, and John owned the remaining 49 percent interest.

In 2002, Anna and John established Wilder Park Properties, LLC, a property holding company that "purchased the property then occupied by Rosa Mosaic, 4023 South Brook Street, as well as other properties."[3] Docket No. 113, at 13. That same year, Anna and John founded Bella Stone Designs, LLC, which fabricates and installs various granite, engineered quartz, terrazzo, and porcelain slabs, and sells stainless steel and porcelain sinks. "Bella Stone represented an opportunity to expand into an area of the tile, terrazzo, and marble market that was adjacent to, but not served, by Rosa Mosaic." Docket No. 113, at 13. As the owners of these three, relatively small companies, Anna and John decided it would make financial sense to spread certain business services costs—payroll, accounting, technology, and marketing—amongst the three companies. They also decided it would be prudent to procure group insurance to cover each company, and thus did so with respect to employee health insurance, workers' compensation insurance, and general liability insurance. In 2007, Anna and John implemented the first version of their "Shared

---

[3] Although this sentence is excerpted from Vesta Tile's summary judgment motion, the Funds claim the following as a contested fact: "Defendant advises the Court that Rosa's offices are at 4006 South Brook Street but do[es] not state that Vesta's offices at 4023 Brook Street were the prior offices of Rosa." Docket No. 116, at 6. Vesta Tile did in fact advise the court that 4023 South Brook Street was Rosa Mosaic's prior offices, and, that it is now Vesta Tile's current office space. That Vesta Tile did not explicitly reference the connection does not warrant the needless repetition found in the Funds' responsive briefing. The Funds also reference this as an undisputed material fact.

Services Agreement," which required each company to be responsible for paying its share of the costs of these joint services and insurance policies. In 2017, Anna and John also founded Venosa, LLC, a precast product manufacturer.

Anna and John formed Vesta Tile in 2010 to operate as a subcontractor for the "installation of hard tile, luxury vinyl tile, carpet tile, resinous coatings, and underlayments." Docket No. 113, at 6.[4] Anna and John were Vesta Tile's sole owners until 2019, when they granted their employee, Ryan Dodson, a four percent ownership interest in the company. Anna and John retained their respective ownership interests. The Funds contest this fact, claiming Vesta Tile has failed to acknowledge that Anna and John granted Ryan the four percent ownership interest only after this lawsuit had been filed.

All five of Anna and John's companies—Rosa Mosaic, Vesta Tile, Wilder Park, Venosa, and Bella Stone—were parties to an updated version of the Shared Services Agreement, which provided for the joint administration of information technology services, negotiation of insurance programs, property management, estimating services, marketing services, and accounting services. Each company was required to pay its proportionate share of any and all services provided to that company under the Shared Services Agreement, which amount was determined based upon the percentage of each service being provided in the case of estimating and accounting services, or upon the cost

---

[4] The Funds cite this as a disputed fact, arguing that "there is no evidence in hundreds of Vesta [Tile] bid estimates or contracts in the record that Vesta [Tile] installs any product other than ceramic tile which is what Rosa [Mosaic] installed prior to Vesta's creation." Docket No. 116, at 7. We discuss this dispute in further detail below.

attributable to employees of the respective company, such as health insurance coverage and property insurance.

### B.  ROSA MOSAIC AND VESTA TILE

We turn next to discuss the relationship between Rosa Mosaic and Vesta Tile, examining their respective business purposes, any commonalities in their management and labor control, and any interrelationships between their operations.

### i.  BUSINESS PURPOSES

Rosa Mosaic has been in the business of tile and terrazzo installation services since 1937, and the company is "well-regarded for its ability to perform highly skilled installation projects" involving terrazzo installation and mud-set tile installation. Docket No. 113, at 12. "Terrazzo installation requires highly skilled craftworkers and more exacting conditions, such as the interior of the project being under climate control." *Id.* at 15. Rosa Mosaic performed this work throughout Kentucky, Indiana, Tennessee, Ohio, and West Virginia, conducting the majority of its work in the Louisville, Kentucky and Southern Indiana area.[5] Although Rosa Mosaic also performed lower-skilled work such as "thinset" tile installation, Anna and John assert that Rosa Mosaic became uncompetitive in the "tenant fit-out" market, which refers to restaurants, hotels, retail, office buildings by developers, and other similar projects, because those projects "often

---

[5] The Funds again contest this fact, claiming that Vesta Tile has failed to acknowledge that over fifty percent of Rosa Mosaic's work is performed in Louisville, Kentucky, and Southern Indiana—the same geographic area serviced by Vesta Tile. We note that the majority of Rosa Mosaic's work is performed in the Louisville/Southern Indiana area, without treating this distinction as a genuine "dispute" of material fact.

utilize product lines and installation methods that require less skill and which, consequently, makes it unfeasible for a contractor to pay a premium for highly skilled labor and still effectively bid on those projects." *Id.* However, Rosa Mosaic still performed some thinset tile installation during the relevant time period.

Beginning in the late 2000s, John and Anna began discussing the idea of forming a non-union tile company "because of the market shift and what tile work [they] could actually successfully get through Rosa and all the work that [they] could not get because of the other nonunion and -- well, the competition as far as the work." Docket No. 116-53, at 6. After having this idea under discussion for several years, Anna and John took the necessary steps to establish Vesta Tile in 2010. The new company (Vesta Tile) provided tile installation services primarily in Kentucky and Southern Indiana, which is the same geographic area where most of the Rosa Mosaic's work is performed, although, as noted by the Funds, Vesta Tile, like Rosa Mosaic, occasionally worked in Tennessee. Vesta Tile proffers as an undisputed fact that it "operates as a subcontractor providing the installation of hard tile, luxury vinyl tile, carpet tile, resinous coatings, and underlayments to the contracting and development community." Docket No. 113, at 6. The Funds challenge this assertion alleging that in the hundreds of Vesta Tile's contracts and bid estimates found in the record of this litigation, no evidence exists to establish that Vesta Tile installed any product other than ceramic tile, which is the same product Rosa Mosaic installed prior to Vesta Tile's creation. As explained in Vesta Tile's summary judgment brief: "Prior to the existence of Vesta Tile, Rosa Mosaic would be a subcontractor to

other companies performing the same type of [thin-set tile installation] work Vesta Tile

now performs." *Id.* at 17.

Over the years, Rosa Mosaic has been more financially profitable than Vesta Tile:

| Year | Vesta Tile Annual Revenue | Rosa Mosaic Annual Revenue |
|------|---------------------------|----------------------------|
| 2010 | $0 | $7,380,329 |
| 2011 | $170,178 | $5,747,788 |
| 2012 | $461,862 | $7,223,015 |
| 2013 | $629,106 | $5,166,448 |
| 2014 | $2,867,887 | $5,363,256 |
| 2015 | $2,441,541 | $3,803,246 |
| 2016 | $1,527,080 | $6,040,075 |
| 2017 | $2,021,711 | $7,784,744 |
| 2018 | $3,622,848 | $7,385,606 |

Docket No. 113-9.[6] Rosa Mosaic subcontracted with Vesta Tile to perform work on many

of Vesta Tile's projects. Payments for this subcontracted work, along with payments

---

[6] In its summary judgment response, the Funds urge the court to consider only the profitability of the years 2010 to 2015, during which Rosa Mosaic's revenues declined by over two million dollars, while Vesta Tile's earnings increased by approximately that same amount. In Vesta Tile's reply, it argues there is no legal or logical basis for limiting the scope of review to these specific years, and, indeed, the Funds themselves rely on many other facts outside that time period. The Funds sought Leave to File a *Surreply Instanter* to respond to this argument. Our Local Rule 56-1 provides that a party opposing a summary judgment motion may file a surreply brief *only* if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply must also be limited to the new evidence and objections. Vesta Tile's reply neither cited new evidence nor objected to the admissibility of the evidence; it addressed an argument that the Funds themselves raised. We therefore deny the Funds' Motion for Leave to File a *Surreply Instanter* [Docket No. 123].

under the Shared Services Agreement, has necessitated frequent transfers of bank funds between Rosa Mosaic and Vesta Tile; from 2013 through 2018, records reflect millions of dollars being transferred between the two companies. Vesta Tile points out that it has subcontracted work to companies other than Rosa Mosaic and that Rosa Mosaic has been engaged to perform work for tile companies other than Vesta Tile. The two companies have both been successful bidders for work on the same projects as well; in those instances, the employees of each company performed only the work that their respective company has been contracted to do. Due to factors of timing and tile installation techniques compared to terrazzo installation, Rosa Mosaic employees typically had completed their work and exited a joint jobsite before any Vesta Tile employee commences work at that location.

### ii. COMMON MANAGEMENT AND CONTROL OF LABOR

We turn next to address the facts relating to the management of Rosa Mosaic and Vesta Tile, along with the companies' control over their respective labor forces.

### 1. JOHN CRISTOFOLI

John had been an employee of Rosa Mosaic for more than thirty-four years, and during the relevant time period, he served as Project Manager and Secretary-Treasurer of the company. John's responsibilities included overseeing all field operations for Rosa Mosaic and supervising the hiring, firing, and discipline of the company's field employees. John also performed estimating services for the company. Regarding Vesta Tile, John had no hands-on involvement or responsibilities, and his compensation from

Vesta Tile came only from his ownership interest. Though Vesta Tile states as an undisputed fact that John does not perform any services for the company and has never been involved in hiring employees for the company, the Funds point out that Anna and John did assign Vesta Tile foreman Amos Pranger to jobs from 2013 through at least 2016, and that Amos reported to John or Anna regarding his Vesta Tile work between 2013 and 2014.

### 2.  ANNA TATMAN

At all relevant times, Anna served as President of Rosa Mosaic and was responsible for the supervision of Rosa Mosaic's office employees and the company's day-to-day operations. However, she did not hire, fire, or discipline Rosa Mosaic's field employees; those duties were John's responsibility. Anna also provided estimating services for the company. As for Vesta Tile, Anna has testified that she was not an employee of that company; when she performed any functions, they are limited to those that are typical of an owner of the company, such as "arranging for financing, if there's reviewing financial statements, consulting on any bank matters, or if there are legal issues that might have arisen via a contract or some warranty work." Docket No. 116-52, at 48. She received no compensation from Vesta Tile apart from her ownership interest. Vesta Tile confirms that Anna "d[id] not perform any services for Vesta Tile" and did not hire, fire, or discipline field employees for the company. Docket No. 113, at 10.

The Funds, however, dispute Vesta Tile's assertion that Anna has not performed any services for Vesta Tile or hired or managed field employees for the company. The Funds

point to Anna's testimony admitting that she has signed documents as Vesta Tile's President since as early as 2013 and continued to sign documents as Vesta Tile's President until at least 2019, as evidenced by Vesta Tile's documents on file with the Kentucky Secretary of State. Anna testified that she was officially named as Vesta Tile's President in 2016 by the company's corporate members, i.e., herself and John. The Funds further note that throughout the relevant time period, Anna was an authorized signatory on Vesta Tile's checking account and credit cards, and she regularly signed business documents for the company and issued checks to suppliers. It was Anna's decision, made when Vesta Tile first started, that it would adopt the subcontractor model being utilized by certain of their non-union competitors. In 2013, it was Anna who decided to change the practice of engaging only subcontractors to employing a small number of field employees and hiring extra subcontractors as needed.

The Funds also point to Anna's history of hiring employees for Vesta Tile, beginning with having hired her husband, Jeff Tatman, as Vesta Tile's head of field operations from 2010 through 2013. In that role, Jeff reported to Anna. However, Jeff was allegedly unaware that he had held any specific position at Vesta Tile. Jeff's role was simply to obtain subcontractors to perform Vesta Tile jobs and then oversee their performance to completion. Anna approved Jeff's hiring of subcontractors and also set their rates of pay. In 2013, Anna hired Amos Pranger, who had previously been employed by Rosa Mosaic, as the first foreman for Vesta Tile. Anna and John assigned Amos to jobs from 2013 through 2016, and he reported directly to Anna and John from 2013 through 2014.

Further, Anna also hired and assigned crew members to assist or work with Amos in 2014. She hired her brother, Louis, to serve as Vesta Tile's Operations Manager in 2017, and thereafter as President in 2019. Louis reported all financial issues to Anna and met with her quarterly to go over the company's finances. It was Anna who selected Ryan Dodson to be Vesta Tile's Vice-President, Chief Estimator, and Project Manager in 2017, and he reported solely to her, rather than to Louis as the company's President. Anna and Ryan collaborated on whether it would be Rosa Mosaic or Vesta Tile who bid on a particular job.

### 3.  RYAN DODSON

When Anna first hired Ryan in 2007, it was to serve as an estimator for Rosa Mosaic, and he remained with Rosa Mosaic until Anna promoted him to serve as Vesta Tile's Vice President, Chief Estimator, and Project Manager in 2017.[7] (Although the Funds do not highlight this part of Anna's deposition testimony, we note that Anna and John also promoted Ryan to serve as the Chief Estimator and Vice President of Rosa Mosaic sometime around 2015). Since 2019, Ryan was authorized to sign checks on Vesta Tile's behalf and to sign contracts on behalf of Vesta Tile. Ryan reported directly to Anna, not Louis, who served as Vesta Tile's current President.

### 4.  LOUIS CRISTOFOLI

---

[7] The Funds contend that it is a disputed material fact whether Ryan worked for Rosa from 2007 until 2017, even though Vesta Tile clearly represents in its undisputed material facts that "[Ryan] Dodson was previously employed by Rosa Mosaic from 2007 to 2017." Docket No. 113, at 11.

Since the 1970s, Louis has worked on and off for Rosa Mosaic. In 2017, Louis, who was working as a field employee for Rosa Mosaic, was hired by Anna to become Vesta Tile's Operations Manager. Anna appointed Louis to be the President of Vesta Tile in 2019, "around the time this lawsuit was filed," as noted by the Funds. Docket No. 116, at 23. Louis oversaw all field operations for Vesta Tile and was responsible for the hiring, firing, and disciplining of Vesta Tile's field employees. As President, Louis was responsible for reviewing Vesta Tile's financial statements, verifying Vesta Tile's costs under the Shared Services Agreement, setting the rate of pay for Vesta Tile's field employees, and participating in negotiations for health insurance coverage for Vesta Tile's employees. He reported Vesta Tile's profits and losses to Anna and met with her on a quarterly basis to review Vesta Tile's finances. However, Louis, in contrast to Anna and Ryan, was not authorized to sign checks drawn on Vesta Tile's checking account.

### 5.   OTHER EMPLOYEES

Vesta Tile's field operations were managed by Jeff Tatman, Anna's husband, beginning from the company's founding in 2010 up until 2013. Following Jeff, a succession of other managers has overseen Vesta Tile's field employees: Kenneth Cox, from May 2013 to January 2015; Timothy Mattingly, from April 2015 to December 2015; Trevor Foy, from May 2017 to May 2018; and Amos Pranger, from January 2015 to 2022. Vesta Tile describes the responsibilities of these managers to include the hiring and firing of field employees and/or the retention of independent contractors, the discipline of field employees, and the oversight on projects. Louis has also allegedly

17

performed these responsibilities on behalf of Vesta Tile since 2017. Vesta Tile proffers as an undisputed fact that "[n]either Anna Tatman nor John Cristofoli have [sic] ever managed the field operations of Vesta Tile." Docket No. 113, at 18. However, the Funds point to Anna and John's supervision of Amos from 2013 through 2016, and Anna's hiring and assigning of field workers to Amos in 2014.

### iii.  INTERRELATION OF OPERATIONS

During the relevant time period, all of Rosa Mosaic's and Vesta Tile's business premises and warehouse spaces were located on the same street—specifically, South Brook Street—in Louisville, Kentucky. Rosa Mosaic's office and warehouse spaces were located at 4006 South Brook Street, which it leased from Wilder Park.[8] Vesta Tile rented a certain amount of warehouse space at Wilder Park's property at 4006 South Brook Street, although Vesta Tile's warehouse space was separated from Rosa Mosaic's warehouse space in a gated location.[9] Vesta Tile's office space was located at 4023 Brook Street, and the company maintained additional warehouse and storage space down the street at 4033 South Brook Street.[10] To occupy these premises, Vesta Tile paid rent as provided for in separate lease agreements with Wilder Park, each in its own name and

---

[8] Wilder Park leased the premises occupied by Vesta Tile, Venosa, and Bella Stone. It also leased space to individuals and entities that have no affiliation with Anna or John.

[9] Although the Funds claim that Vesta Tile did not advise the Court that it shared space in the same warehouse as Rosa Tile, Vesta Tile did include as undisputed material facts that Vesta Tile and Rosa Mosaic both occupied warehouse space at 4006 South Brook Street, and that the warehouse spaces are separated by gates.

[10] Again, the Funds dispute whether Vesta Tile advised the court that Vesta Tile's current office space at 4023 South Brook Street are the same premises previously occupied by Rosa Mosaic, but Vesta Tile did in fact inform the court that Rosa Mosaic previously occupied this location in its factual background section. The Funds also included this fact in their undisputed facts.

separately from the others.[11] Vesta Tile represents as an undisputed material fact that it has never maintained offices at 4006 South Brook Street. However, the Funds dispute this fact citing that Ryan—Vesta Tile's Vice President, Project Manager, Chief Estimator, and part-owner—has continuously occupied his same office within Rosa Mosaic's office space at 4006 South Brook Street, despite having become a Vesta Tile employee in 2017.

As previously noted, Rosa Mosaic, Vesta Tile, Wilder Park, Venosa, and Bella Stone were parties to the Shared Services Agreement covering the joint administration of their information technology, the negotiation of insurance programs, property management, estimating services, marketing services, and accounting services. As the Funds point out, this means that "accounts payable, accounts receivable, payroll, financial accounting, computers, insurance, estimating and all other office functions for Vesta [Tile] are performed by a Rosa [Mosaic] employee." Docket No. 116, at 12. Vesta Tile and Rosa Mosaic have also engaged the services of the same accountant and same legal counsel, both of whom were hired by Anna.

Under the Shared Services Agreement, Ryan provided estimating services to Vesta Tile while he was an employee of Rosa Mosaic. Indeed, Anna asked Ryan if he wanted to become a Vesta Tile employee because he had been spending so much time estimating jobs for Vesta Tile under the Shared Services Agreement. Thereafter becoming a Vesta

---

[11] The Funds contest this fact claiming that Vesta Tile "fail[s] to acknowledge that Anna and John, who own Wilder Park, determine the rental rates for all leases and sign the leases as lessor and lessee." Docket No. 116, at 7. The Funds assert as undisputed material facts that "Anna and John set the rental rate for Vesta and Rosa," and that "Rosa and Vesta pay rent to Wilder Park which is a real estate company owned by Anna and John." *Id.* at 10.

Tile employee, Ryan continued to estimate jobs for both Vesta Tile and Rosa Mosaic under the Shared Services Agreement. In submitting a bid, Ryan would confer with either Anna or John to determine whether to bid the job under Vesta Tile's name or Rosa Mosaic's. Ryan and Anna would engage on an almost daily basis about bids and any problem jobs. Ryan and Anna also would discuss the fact that union wages were higher than non-union wages and that Vesta Tile's wage portion of estimates was less than Rosa Mosaic's for that reason. Anna testified that labor costs were a large component of the estimates she prepared in her efforts to properly price a job. The two companies also utilized the same document template for job bids. Ryan and Anna both maintained separate email addresses for Vesta Tile and Rosa Mosaic, deciding which one to use depending on which company's project they were working on. Ryan also ordered materials for both companies, and Anna wrote checks to pay Vesta Tile's suppliers for their materials.

The parties have stipulated that a total of more than thirty people have been employed by both Vesta Tile and Rosa Mosaic at separate times over the years. Vesta Tile and Rosa Mosaic have had in common a total of seventeen customers. Rosa Mosaic and Vesta Tile have maintained separate bank accounts under their respective names at PNC Bank. Rosa Mosaic maintained its assets under its own name, including machinery, tools, vehicles, and office equipment. Vesta Tile also maintained its assets under its own name, including machinery, tools, vehicles, and office equipment. However, the Funds contest this alleged fact, arguing that Vesta Tile has never owned machinery or vehicles and that it made deliveries to Vesta Tile job sites utilizing Rosa Mosaic employees. In its reply brief,

20

Vesta Tile has acknowledged that because it did not and does not own delivery vehicles, Vesta Tile has arranged for materials to be delivered to projects primarily by vendors, but, when a vendor cannot provide delivery, Vesta Tile will contract with Rosa Mosaic to perform the delivery.

### C.  THIS LITIGATION

On September 12, 2019, Plaintiffs filed this lawsuit pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging in Count I that Vesta Tile and Rosa Mosaic are a single employer jointly and severally liable for unpaid benefits owed to union employees, and in Count II, that Vesta Tile is the successor and/or alter ego of Rosa Mosaic such that Vesta Tile is liable to Plaintiffs for all of Rosa Mosaic's debts and obligations. Rosa Mosaic has consistently made the required contributions to Plaintiffs on behalf of its employees, pursuant to the successive collective bargaining agreements between Rosa Mosaic and the Union, covering its bargaining unit employees. However, the obligation of Rosa Mosaic to pay pension benefit contributions to Plaintiffs on behalf of its employees ceased on June 1, 2021, when Rosa Mosaic and the Union executed a new collective bargaining agreement under the terms of which Rosa Mosaic and the Union agreed that contributions would thereafter be made to a Union-sponsored 401(k) defined contribution plan, rather than the Union-sponsored defined benefit pension fund. Plaintiffs seek in this litigation to recoup the amount of unpaid benefits Vesta Tile allegedly should have been contributing on behalf

of their employees because Vesta Tile is bound by the terms of Rosa Mosaic's collective bargaining agreements as either a single employer or the alter ego of Rosa Mosaic.

This case was stayed and procedurally closed on August 17, 2021, after Rosa Mosaic filed for bankruptcy, which proceeding remains pending. Plaintiffs thereafter moved to reopen the case and have the stay lifted as to Vesta Tile. On February 11, 2022, the Court granted the motion to reopen, concluding that "Vesta Tile, as a non-debtor entity, is not entitled to the benefits of the automatic stay extended to Rosa Mosaic as a debtor in a Chapter 11 bankruptcy proceeding." Docket No. 110, at 8. Vesta Tile has filed on its behalf the pending Motion for Summary Judgment now before the Court.

## III.   LEGAL DISCUSSION AND DECISION

We now examine the evidence to determine whether genuine issues of material fact preclude summary judgment regarding whether Vesta Tile and Rosa Mosaic are a "single employer," or Vesta Tile is the "alter ego" of Rosa Mosaic and, if not, whether Vesta Tile is entitled to summary judgment in its favor.

### A. SINGLE EMPLOYER DOCTRINE

The Funds contend that Rosa Mosaic and Vesta Tile, together, formed a single employer for purposes of applying the successive collective bargaining agreements. "The single-employer doctrine provides that 'when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes.'" *Chi. Reg. Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 403 (7th Cir. 2016) (quoting *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998)). "To determine whether two nominally separate

22

business entities are a single employer, one must examine four factors set out by the Supreme Court: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsman, Dist. Council of Wis. & Its Local 5*, 724 F.3d 939, 946 (7th Cir. 2013) (citing *Trs. of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 788 (7th Cir. 1993); *South Prairie Constr. Co. v. Local No. 627*, 425 U.S. 800, 803 (1976)). "No one of these factors is conclusive; instead, the decisionmaker must weigh the totality of the circumstances." *Id.* (quoting *Favia*, 995 F.2d at 788). "Ultimately, single employer status . . . is characterized by the absence of an arm's length relationship found among unintegrated companies." *Id.* at 947 (quoting *Lihli Fashions Corp., Inc. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996)).

In conducting our analysis, the Seventh Circuit's 2013 decision in *Lippert* is closely analogous and highly instructive:

> Brothers Les and Jeff Lippert established Lippert Tile Company, Inc. ("Lippert Tile"), a floor tile installation company, in 2000. Lippert Tile services customers in the four-county Greater Milwaukee area. The Bricklayers and Allied Craftsmen, District Council of Wisconsin and its Local 5 (collectively, the "union") represent the tile installation workers of Lippert Tile. The governing collective bargaining agreement ("CBA") between the union and Lippert Tile provided for certain benefits and wages for the employees and prohibited Lippert Tile from "sublet[ting], assign[ing] or transfer[ring] any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation except where the Employer signifies and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement."

> . . .

Lippert Tile's market for tile installation work includes general contractors subject to their own collective bargaining agreements, project owners having or wanting to use union-represented tile contractors, and government-regulated entities tending to use union labor due to prevailing wage regulations (the "union market"). Over the last 10 years, however, this market has been declining, and more customers in the region have sought non-union tile installers, generally because they are 25% to 45% cheaper (the "non-union market"). Because the Lippert brothers believed it was futile for Lippert Tile to try and compete in this growing non-union market, the brothers in 2004 created a new tile installation company, DeanAlan, that would only use non-union workers and compete only in the non-union tile installation market for the same four counties. (The creation of a non-union company for this purpose is known as "double-breasting.")

They also created the Lippert Group, a corporate entity that would provide management services to both tile installation companies. Subsequently, Lippert Tile continued providing tile installation services to the union market, while DeanAlan provided tile installation services to the non-union market in the same area. All three companies—Lippert Tile, DeanAlan, and the Lippert Group—lease office and warehouse space in the same building which is owned by the Lippert brothers. DeanAlan also rents trucks from, and orders its supplies through, Lippert Tile. The Lippert Group provides administrative services for the other two companies, maintaining business records, processing payroll, handling billing, and managing bank accounts. The Lippert Group also supplies both companies with office and warehouse staff, including salesmen and estimators, who decide which company will bid on a project and how much to bid. At the same time, the companies do not share space within the building and have separate lease arrangements (though with the same owners). They do not share equipment. They have different corporate officers, separate bank accounts, separate lines of credit, and separate insurance programs. And because the whole point of creating DeanAlan was to serve the non-union market with non-union labor, the companies naturally have separate employees and separate customers.

*Id.* at 941−42. In *Lippert*, pursuant to the governing collective bargaining agreement, the union filed a grievance with the joint arbitration committee ("JAC") seeking union benefits for the non-union tile installers working for DeanAlan. *Id.* at 941. After the JAC granted the requested relief, the companies petitioned to vacate the award in federal

district court, arguing that DeanAlan should not have been bound by the arbitration award because it was not a part of the collective bargaining agreement. *Id.* However, the district court granted summary judgment on the union's motion to enforce the award, finding that the nominally new company could be treated as one and the same with the old company for purposes of the agreement under the "single employer" doctrine. *Id.* The companies appealed to challenge the district court's finding that they were a "single employer," but the Seventh Circuit "agree[d] with the district court that the companies, which are centrally operated by the same entity, are one and the same for purposes of arbitrability under the contract." *Id.* We apply the Seventh Circuit's four single-employer factors as set forth in *Lippert* in conducting our analysis here:

### i. COMMON OWNERSHIP

Regarding common ownership, the parties do not dispute that such was the case here. Despite Ryan's four-percent ownership interest in Vesta Tile, which he acquired in 2019, Anna and John were the exclusive owners of both companies during virtually the entire relevant time period. Thus, the single-employer ownership element has been established.

### ii. COMMON MANAGEMENT

As teed-up by the Seventh Circuit's decision in *Lippert*, "though Lippert Tile and DeanAlan technically have different corporate officers, the 'common management' factor looks at 'actual or active control, as distinguished from potential control, over the other's day-to-day operations,' and certainly not formal job titles." *Id.* at 947 (quoting *Cimato Brothers, Inc.*, 352 NLRB 797, 799 (2008)); *see also Lihli*, 80 F.3d at 747 (disregarding

25

the fact that someone was 'president' when he had no actual management responsibility). In applying this analytical approach, the Seventh Circuit concluded that "[b]ecause the same entity not only operates, but also controls, the bidding process and administrative tasks for both companies, the 'common management' factor weighs in favor of a single employer finding." *Lippert*, 724 F.3d at 947.

We cannot be as certain here with regard to this factor as the Court was in *Lippert*. The most we can say is that genuine issues of material fact preclude summary judgment. It is clear that Anna has performed all management duties as Rosa Mosaic's President throughout the relevant time period from 2010 through 2019. However, many factual disputes remain as to whether she was performing these same duties as well for Vesta Tile. Prior to 2019, no other person held the title of President of Vesta Tile. Throughout the relevant time period, Anna was signing documents and issuing checks as the Vesta Tile's President, after having been made its President in 2016 by virtue of a corporate resolution. It was she who instituted the employment model for Vesta Tile and supervised at least two of the company's field operations managers. She also hired Ryan to serve as Vesta Tile's Vice President, Chief Estimator, and Project Manager, and continued to supervise him for years; he has reported exclusively to her, even after Louis was hired as President. She and Ryan decide jointly whether Vesta Tile would bid on projects or Rosa Mosaic. She hired Louis as the Vesta Tile's Operations Manager in 2017 and advanced him to President in 2019, around the time of this lawsuit. Anna also exercises exclusive

signing authorization on all the company's financial instruments, which Louis, as Vesta Tile's President, does not share. She also wrote checks to Vesta Tile's suppliers.

Vesta Tile characterizes these duties as performed by Anna as those of a business owner, although these facts, if accurately recounted, exceed Anna's own testimony as to the functions she actually performs as Vesta Tile's owner.[12] Vesta Tile describes John's role as representing the management of Rosa Mosaic because he controls the hiring, firing, and discipline of field employees, and Louis's role as also representing the management of Vesta Tile on the same basis. This argument, however, conflates the common management factor under *Lippert* with the control of labor relations factor. Who controls the hiring, firing, and discipline of field employees is relevant only in the context of determining who controls the labor relations. Vesta Tile concedes that Anna provided all the management of Rosa Mosaic, but genuine issues of material fact exist as to whether she performed the management role for Vesta Tile as well.

In *Lippert*, the Court wrote, when "the same entity not only operates, but also controls, the bidding process and administrative tasks for both companies, the 'common management' factor weighs in favor of a single employer finding." *Id.* Here, evidence exists to substantiate that Anna, Rosa Mosaic's President, and Ryan, Vesta Tile's Chief Estimator and Vice-President, determined which of the two companies would bid on a

---

[12] As previously mentioned, Anna testified that her duties as Vesta Tile's owner are "arranging for financing, if there's reviewing financial statements, consulting on any bank matters, or if there are legal issues that might have arisen via a contract or some warranty work." Docket No. 116-52, at 48.

particular project. Ryan also performed estimating services for both companies over many years. Rosa Mosaic employees, who are managed by Anna, perform *all* of the administrative tasks both companies under the Shared Services Agreement. *See id.* ("Because the same entity not only operates, but also controls, the bidding process and administrative tasks for both companies, the 'common management' factor weighs in favor of a single employer finding."). Whether Vesta Tile and Rosa Mosaic operated with common management is an issue that cannot be resolved on summary judgment due to the conflicting underlying facts.

### iii.  CENTRALIZED CONTROL OF LABOR RELATIONS

Again, in *Lippert*, the Court found that "there was centralized control of labor relations because it was the Lippert brothers' decision in the first place to create a new company that would give room to a new, non-union labor system solely to serve the non-union market." *Id.* "So while it is not entirely clear who was responsible for day-to-day labor relations decisions like setting wages (for the non-union workers), hiring, or firing, the overall parameters were set in place by the Lippert brothers when they decided to create separate union and non-union entities." *Id.*

Here, the evidence establishes that John and Anna together decided to create Vesta Tile to provide room for a new, non-union labor system that could serve the markets in which they believed Rosa Mosaic and its more expensive labor force could not effectively compete. While John was responsible for the hiring, firing, and disciplining of Rosa Mosaic's field employees, genuine issues of material fact exist as to whether John

and/or Anna were also responsible for the hiring, firing, and disciplining of Vesta Tile's field employees and independent contractors at various times throughout the company's existence. The Funds emphasize that Anna and John made the decision to assign Vesta Tile foreman Amos to jobs from 2013 through at least 2016, and that Amos reported to John and Anna on his Vesta Tile work between 2013 and 2014. Anna was reportedly in charge of setting the subcontractors' rate of pay from 2013 to 2014, and of hiring and assigning field employees to with with Amos. In sum, whether Vesta Tile and Rosa Mosaic had common control of labor relations remains unresolved, and thus is a triable issue of fact.

### iv.  INTERRELATION OF OPERATIONS

"[W]hen analyzing the interrelation of operations, it is the 'day-to-day operational matters' that are the most relevant." *Id.* In *Lippert*, the companies did not occupy shared space and maintained separate lease arrangements (though with the same owners). The Seventh Circuit noted that the "companies do not share the exact same space but are housed in the same warehouse, making shared supervision of both companies easier." *Id.* The companies in *Lippert* did not share equipment and had separate bank accounts, lines of credit, and insurance programs from one another. They also had different corporate officers and because the whole point of creating DeanAlan was to perform work within the non-union market utilizing non-union labor, the two companies naturally maintained separate employees and separate customers. The Seventh Circuit, however, still found their operated interrelated because the companies "still served the same geographic area

and performed the exact same labor," and a single entity "maintain[ed] business records, processe[d] payroll, handle[d] billing, and manage[d] bank accounts for both companies, and these shared, daily operations are critical to the smooth functioning of the project-by-project nature of both companies' work." *Id.* "More importantly, the Lippert Group personnel make the critical decision whether Lippert Tile or DeanAlan should make a bid on a particular project, and if so, what to bid, as if all three companies were part of the same organizational chart." *Id.* "So on balance," the Court found, "the operations [were] extensively interrelated if not intertwined." *Id.*

Applying this analysis to our case reveals the existence of substantial, genuine issues of material fact as to whether Vesta Tile's and Rosa Mosaic's operations were actually or sufficiently interrelated. Vesta Tile and Rosa Mosaic did not share equipment, bank accounts, or lines of credit. They did not share warehouse space but were housed in the same warehouse and maintained lease agreements (albeit separately) to the same owners, i.e., Anna and John. Vesta Tile and Rosa Mosaic potentially had the same corporate officers. Moreover, Vesta Tile and Rosa Mosaic have seventeen general contractor customers in common, and both perform tile installation work in the same geographic area. More than thirty employees have at some point worked for both companies. Rosa Mosaic employees performed *all* of the administrative tasks for Vesta Tile under the Shared Services Agreement. The two companies engaged the services of the same accountant, attorneys, and insurers. Most importantly, their common management involved the same principals making all the critical decisions as to which company would

30

bid on any particular project and treating both companies together as parts of a single organizational chart. This evidence does not break entirely in favor of either party's theories of the case, leaving triable issues of material fact for a jury or a factfinder to resolve.

Given the genuine issues of material fact that exist in the record as to all four factors under the single employer analysis, summary judgment is unavailable, requiring the denial of Vesta Tile's motion.

### B.  ALTER EGO ANALYSIS

As an alternative basis for liability, the Funds contend that Vesta Tile was the alter ego of Rosa Mosaic and, thus, is subject to the collective bargaining agreements executed by Rosa Mosaic. "Whether an individual or an entity is the alter ego of another 'focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.'" *Ind. Carpenters Pension Fund v. Hammond*, 2019 WL 9093756, at *7 (S.D. Ind. Apr. 23, 2019) (quoting *Int'l Union of Operating Eng'rs, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987)). Alter-ego liability incorporates "a *scienter* component coupled with an analysis of similarities between the old and new entities*." McCleskey v. CWG Plastering, LLC*, 897 F.3d 899, 903 (7th Cir. 2018). A plaintiff seeking to impose alter-ego liability must show "a fraudulent intent to avoid collective bargaining obligations," and once *scienter* is established, a plaintiff "additionally must show 'substantially identical management, business purpose,

operation, equipment, customers, supervision, and ownership.'" *Id.* (quoting *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427, 433 (7th Cir. 1998)). The alter ego analysis "differs from the single employer doctrine in that 'unlawful motive or intent is the most critical factor for finding alter ego status in the Seventh Circuit.'" *Chi. Reg. Council of Carpenters Pension Fund v. TMG Corp.*, 206 F.Supp.3d 1351, 1361 (N.D. Ill. 2016) (quoting *Trs. of Chi. Painters and Decorators Pension Fund v. John Kny Painting & Decorating, Inc.*, 2016 WL 406328, at *3 (N.D. Ill. Feb. 3, 2016)).

Here again we find genuine issues of material fact requiring a factfinder to determine whether Vesta Tile was Rosa Mosaic's alter ego. We need not repeat the abundant evidence summarized above in our single-employer analysis regarding whether Vesta Tile and Rosa Mosaic had substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership. *Rabine*, 161 F.3d at 433. Moreover, genuine issues of material fact also exist as to whether Anna and John possessed an unlawful motive or intent, seeking to avoid the obligations of Rosa Mosaic's collective bargaining agreements with the Union. The Funds have adduced evidence that Anna and John purposely created Vesta Tile to allow them to hire non-union labor and bid on jobs that Rosa Tile, given its more expensive labor union affiliated workforce, was unable to secure. A reasonable factfinder could conclude that by operating Vesta Tile in tandem with Rosa Mosaic, John and Anna were able to expand their business to include both union and non-union tile installation work by avoiding the required contributions to the Funds for bargaining unit work on non-union jobs. In its reply, Vesta Tile describes

its company as a permissible form of double-breasting; this, however, is a matter a factfinder must decide. Accordingly, we deny Vesta Tile's summary judgment motion on this alternative basis. *See also Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593, 597 (7th Cir. 1990) (relying in part upon ownership of businesses by members of the same family in holding that the businesses were "alter egos").

## IV.   CONCLUSION

Accordingly, Vesta Tile's Motion for Summary Judgment [Docket No. 112] is **DENIED**. As for Plaintiffs' Motion for the Court to Take Judicial Notice of Certain Facts and Supplement the Record [Docket No. 111], it is **GRANTED** and their Motion for Leave to File a *Surreply Instanter* [Docket No. 123] is **DENIED**.


IT IS SO ORDERED.


Date: 03/23/2023

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Jacob Wayne Crouse
SMITH & SMITH ATTORNEYS
jwc@smithandsmithattorneys.com

Kevin Michael Norris
SMITH & SMITH ATTORNEYS
kmn@smithandsmithattorneys.com

Grant R. Piechocinski
ARNOLD & KADJAN
gp@aandklaw.com

Donald D. Schwartz
ARNOLD & KADJAN
dds@aandklaw.com

James U. Smith, III
SMITH & SMITH
jus@smithandsmithattorneys.com